UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEA CARRIERS LP I and : Case No. 07-civ-4658 (LAP)
SEA CARRIERS CORPORATION :
(individually and on behalf of those : **DECLARATION OF**
similarly situated), : **PROPOSED LEAD PLAINTIFFS**
: **SEA CARRIERS LP I and**
v. : **SEA CARRIERS CORPORATION**
:
NYSE EURONEXT, INC., et als. : **Document Electronically Filed**
:

---

I, Per G. Barre, under penalties of perjury, hereby declare as follows:

1.    I am the sole managing member of the sole general partner of Sea Carriers LP I.   The

general partner, Sea Carriers Management LLC, has designated me as the sole authority to direct

the affairs of Sea Carriers LP I, including the affairs related to Sea Carriers LP I's efforts to

recover damages for the wrongdoings alleged in the Complaint.   I am also the president, chief

executive officer and owner of Sea Carriers Corporation.

2.    I refer to Sea Carriers LP I and Sea Carriers Corporation collectively as the "Sea

Carriers Group."

3.    I submit this declaration in support of Plaintiffs' motion to appoint Sea Carriers LP I

and Sea Carriers Corporation as Lead Plaintiffs in this putative class action, and to appoint

Becker Meisel LLC ("Becker Meisel") and Schatz Nobel Izard, P.C. ("Schatz Nobel") as co-

Lead Counsel. I have full knowledge of the facts set forth herein.

## IDENTIFICATION OF MOVANTS

4.    Sea Carriers LP I and Sea Carriers Corporation are Delaware entities.

5. Other than the fact that it is owned and operated by me, Sea Carriers Corporation is not affiliated (e.g., as a subsidiary or parent corporation) in any way with Sea Carriers Management LLC or Sea Carriers LP I.

6. Sea Carriers Management LLC is not a party to this lawsuit, nor does it seek appointment as a lead plaintiff herein. Rather, Sea Carriers Management LLC, under the provisions of its operating agreement and the limited partnership agreement of Sea Carriers LP I, has designated me as the sole authority to direct this litigation on Sea Carriers LP I's behalf. I reference Sea Carriers Management LLC in this declaration simply to provide context to the structure of the companies making this application.

## REQUIRED DISCLOSURES

7. I am duly authorized to execute this declaration on behalf of Sea Carriers LP I and Sea Carriers Corporation, which were the entities that purchased and sold the subject securities described herein.

8. I have reviewed the Complaint and authorized its filing on behalf of Sea Carriers LP I and Sea Carriers Corporation. Sea Carriers LP I and Sea Carriers Corporation are willing to serve as Lead Plaintiffs. I am aware that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at depositions and during trial, if necessary.

9. The Sea Carriers Group did not acquire any securities forming the subject matter of this lawsuit at the direction of its counsel, or in order to participate in this putative class action or any other legal proceeding arising under the federal securities laws.

10. If appointed Lead Plaintiffs, Sea Carriers LP I and Sea Carriers Corporation will not accept any payments for serving as a representative party on behalf of the class beyond their pro

rata share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

11.    During the three years preceding the date of this declaration, neither I personally, nor Sea Carriers LP I nor Sea Carriers Corporation have served as a lead plaintiff or representative party on behalf of a class in any action filed under the federal securities laws.  Within that same time period, Sea Carriers LP I and Sea Carriers Corporation have applied to serve as lead plaintiff in the *In re NYSE Specialists Securities Litigation* class action (Index No. 03-Civ-8264 (RWS)) currently pending in the United States District Court for the Southern District of New York, which applications were denied. *Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395 (S.D.N.Y. 2004); *In re NYSE Specialists Securities Litigation*, 240 F.R.D. 128 (S.D.N.Y. 2007).

## IDENTIFICATION OF FINANCIAL INTEREST

12.    During the Class Period defined in the Complaint (to wit, between October 17, 1998 and June 20, 2007), Sea Carriers LP I and Sea Carriers Corporation traded approximately 6.6 billion shares of stock (designated as market orders) listed on the New York Stock Exchange ("NYSE") via the NYSE's electronic Super Designated Order Turnaround System ("SuperDOT").  The breakdown of each entity's trades is as follows:

   a. Between August 1, 1998 and December 31, 2002, Sea Carriers Corporation traded approximately 4.5 billion shares through a joint venture partnership or other form of contractual relationship with an entity known as "Empire Programs, Inc."[1]

   b. Between January 1, 2003 and October 15, 2003, Sea Carriers LP I traded approximately 1.3 billion shares in a limited partnership structure with Sea Carriers Management LLC.

---

[1]    The issue of whether a joint venture relationship existed between these parties is presently in litigation before the Honorable Robert W. Sweet in a proceeding captioned *Sea Carriers Corporation v. Empire Programs, Inc. and Robert A. Martin.*, Case No. 04-cv-7395 (RWS).

3

     c.  Between October 16, 2003 and March 28, 2005, Sea Carriers LP I traded approximately 800 million shares, also in a limited partnership structure, with Sea Carriers Management LLC.

13.    Of Sea Carriers Corporation's trades executed between 1998 and 2002 as part of its joint venture or other form of contractual relationship with Empire Programs, Inc., a substantial majority during 2002 (more than 85%) were trades in  NYSE-listed securities placed through SuperDOT.  A somewhat lesser percentage of trades (approximately 73%) were executed during 2001.  During the period, Sea Carriers Corporation did trade some NASDAQ issues.

14.    A summary table noting the volume of trades made from 1998 until 2002 is attached as Exhibit A.  This table is based upon operational summary reports created and maintained in the course of the venture's business, which reports disclose the volume of the venture's trades (including NASDAQ trades) for each month between 1998 and 2002.

15.    To demonstrate the reliability of the Sea Carriers Group's calculation of the amount of NYSE-listed shares traded directed through SuperDOT, I recovered and analyzed Sea Carriers Corporation's June 2001 trade data, submitted herewith as Exhibit B.  This data confirmed that Sea Carriers Corporation traded 112,306,700 shares through the SuperDOT system during June 2001.

16.    The overwhelming majority of Sea Carriers LP I's trades were executed in NYSE-listed securities through SuperDOT.  These are also listed on Exhibit A.  Details of the transactions which took place between May 2003 and December 2004 are also preserved in a single file, the relevant portion of which is submitted on a CD due to its size (as Exhibit C).

17.    Further, additional summary reports with descriptions of the aggregate number of orders transacted between May 2003 and December 2004,  grouped by listed issue (excluding NASDAQ-listed securities), are attached as Exhibit D (ordered and executed shares by issue),

4

5

Exhibit E (daily purchases by issue) and Exhibit F (daily sales by issue) .    Additional documents, reflecting the general magnitude of shares executed, as referenced on Exhibit G (1998 – 2002 Operational Summaries),  Exhibits H to J (portions of Spear Leeds Kellogg Account Statements and Monthly P&Ls),  Exhibit K (sample Credit Lyonnais trade confirms for 10/24/04) and Exhibit L (Calyon Account Statement of Sept. 2004), are also submitted as exhibits.

18.    For a number of reasons, including the extraordinarily large volume of the Sea Carriers Group's trading, the production of all trading records in hard copy along with this declaration is not practicable.  Additional data may be produced in electronic format, should the Court so require.

## SATISIFACTION OF RULE 23 CRITERIA

19.    I believe that the Sea Carriers Group's specialized knowledge, experience and diligence will greatly benefit the Class.

20.    During the Class Period, the Sea Carriers Group maintained a technologically sophisticated trading operation in Greenwich, Connecticut.

21.    The primary strategy driving the Sea Carriers Group's proprietary trading platform was to trade a very high-volume of smaller blocks of trades, which is to say trades of 1,000 shares or less.  In fact, a substantial percentage of the trades were of 500 shares or less.

22.    Although the Sea Carriers Group did not trade in the same securities throughout the entire Class Period, it confined its trades to highly liquid, large-cap securities, the majority of which were contained in the S&P 500 index.

23.    The Sea Carriers Group's objective was to trade equities in high velocity and high volume to turn small profits on small-block trades. Quick, reliable and efficient execution was essential to the strategy.

24.    To illustrate, the Sea Carriers Group made approximately 6,400,000 trades during the 2003 calendar year, averaging approximately 30,000 trades per day. As stated above, the total number of shares purchased and sold as part of these trades was approximately 1.3 billion, and the total dollar value of these trades was approximately $59 billion. For purposes of comparison, such volume, at times, constituted 10% or more of the NYSE's daily number of transactions in its most active securities.

25.    Because of the nature of its trading operation and the sheer volume of its trading, the Sea Carriers Group has unparalleled experience and knowledge concerning SuperDOT execution on the NYSE during the Class Period.

26.    In addition, as a result of its trading volume, the Sea Carriers Group has accumulated an invaluable and unmatched set of transaction data and other resources, which will greatly benefit the Class. For example, the Sea Carriers Group can document exactly when an order to purchase or sell a security was placed; exactly how long the order took to execute; the price at which the order was executed; and the sequences in which different orders were executed.

27.    The internal resources developed by the Sea Carriers Group relating to the processing and execution of orders, as well as its developed analytical techniques and skill, have been instrumental in uncovering the wrongdoings alleged in the Complaint.    One important resource which the Sea Carriers Group will make available for the benefit of the Class is its system-building know-how. It was out of the inability to overcome the access biases and resolve the information disadvantages that the Sea Carriers Group developed the ability to identify and assist

in uncovering the alleged unlawful conduct. If appointed as Lead Plaintiffs, the Sea Carriers Group will continue to make these resources available to effectively prosecute this action.

28.    Over the past two years, the Sea Carriers Group has demonstrated its diligence and determination to pursue this action in the best interests of the Class. The Sea Carriers Group has pursued these claims at great personal expense and sacrifice.

29.    The Sea Carriers Group has devoted significant time and resources to the analysis underpinning the Complaint. Sea Carriers devoted substantial time in adapting its past experience and resources as part of investigative efforts leading up to the filing of the Complaint.

30.    The Sea Carriers Group engaged counsel to conduct a confidential and privileged investigation and analysis of the wrongdoings alleged in the Complaint. I personally have spent approximately 2,000 hours assisting counsel with this investigation and analysis over the past two years. The results of the investigation will be of immeasurable value to the putative class. In fact, I am not certain that the action can be prosecuted as pleaded without that analysis.

31.    I am confident in the ability of Becker Meisel and Schatz Nobel to prosecute this litigation in a manner that will maximize the return to the Class. I have had the opportunity to work with attorneys at Becker Meisel for some time on matters relating to this lawsuit. Becker Meisel, with their associated economic experts, has impressed me with its capacity to integrate legal, economic and related expertise for application to otherwise highly complex factual investigations. In this case in particular, that combined expertise has been instrumental in utilizing the Sea Carriers Group's data and experience as an investigative tool. Becker Meisel has shown itself particularly adept in distinguishing the effects of departures from market controls from the effects of non-relevant background market forces.

7

32.    To bolster the team's resources, Becker Meisel retained Schatz Nobel, a noted class action firm. I have confidence in Becker Meisel's retention of Schatz Nobel as co-counsel.

## CONCLUSION

33.    The Sea Carriers Group seeks appointment as Lead Plaintiffs because of the magnitude of its financial interest in this litigation; its desire to maximize both its recovery and the recovery of the putative class; and its contention that its institutional experience and knowledge would greatly benefit the class.

I hereby declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Per G. Barre

Dated: August 20, 2007
        Stamford, CT

8